UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| _____ ) | |
| R. ALEXANDER ACOSTA, ) | |
| Secretary of Labor, ) | |
|     Plaintiff ) | Civil Action No. 1:18-cv-262-PB |
| ) | |
| v. ) | |
| ) | |
| LOCAL 1400, COMMUNICATIONS ) | |
| WORKERS OF AMERICA, ) | |
| AFL-CIO, ) | |
|     Defendant ) | |
| _____ ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

Pursuant to this Court's order dated June 27, 2019, Defendant Communications Workers of America, Local 1400 ("Local 1400" or "Union") submits this response to the Plaintiff's Statement of Material Facts, Dkt No. 32. This filing is in support of Defendant's objection to the Plaintiff's Amended Motion for Summary Judgment, Dkt. No. 26.

1.      Local 1400 is a telecommunications labor organization consisting of approximately 950 members and spread throughout New Hampshire, Vermont, Maine, and Massachusetts. See Excerpts of Deposition Transcript of Christopher McPherron ("McPherron Dep."), DN 26-2 at 27-28.

Defendant's Response: Admitted.

2.      The members of Local 1400 serve as telecommunications customer service representatives who field calls for service and billing-related issues, and who sell Fios and internet-related products to consumers. See Excerpts of Deposition Transcript of Donald Trementozzi ("Trementozzi Dep."), DN 26-3 at 7; Excerpts of Deposition Transcript of Krystal

Talbot ("Talbot Dep."), DN 26-4 at 7.

    Defendant's Response:  Admitted in part and disputed in part. In both instances, deponents are only speaking to their individual work histories while a member of Local 1400 and are not describing work of the Union's members generally. Local 1400 members are employed at diverse job sites with a range of duties, including AT&T wireless retail stores and WGBH. Dkt. No. 29-1, at ¶ 4.

    3.    Local 1400 is, and at all times relevant to this action has been, a local labor organization engaged in an industry affecting commerce within the meaning of section 3(i) and 401(b) of the LMRDA, 29 U.S.C. §§ 402(i) and (j) and 481(b). DN 1, DN 7, ¶ 6.

    Defendant's Response: Admitted.

    4.    Elections for Local 1400's officers are held every three years in November, and the winners assume office in January of the following year. Trementozzi Dep., DN 26-3 at 11; Local 1400 By-Laws, C.W.A. – AFL-CIO, DN 26-4 at 97-98.

    Defendant's Response: Admitted.

    5.    Local 1400 held an election for the offices of President, Executive Vice President, Recording Secretary, Treasurer, District 2 Vice President, District 3 Vice President, District 4 Vice President, and District 5, 6, 7 Vice President, which was completed on October 4, 2017, by acclamation. DN 1, DN 7, ¶ 8; CWA Local 1400 Certification of General Election, DN 26-4.

    Defendant's Response:  The cited record does not fully support the stated averments. Plaintiff cites to Dkt. No. 26-4 ("CWA Local 1400 Certification of General Elections"), which is presumably a reference to Exhibit 22 of the deposition. That document reflects that the office of District 2 Vice President was contested and that that election was not completed by acclamation.

See Dkt. No. 26-4, at 105.

6.      Since assuming the position of President in January 2009, Trementozzi remained as the uncontested President until the 2017 election. Trementozzi Dep., DN 26-3 at 16-17.

Defendant's Response:  Admitted. Defendant notes that Mr. Trementozzi previously lost an election in 2005. Dkt. No. 26-03, at 14-16.

In addition, Defendant further offers the following. In prior elections, members of his slate have been defeated, as has Trementozzi himself. Dkt. No. 29-03, 14:25-15:10; 107:21-108:24.  Evinson and Delaney were originally elected as part of Trementozzi's slate, but were also re-elected despite his support for candidates opposing them. Dkt. No. 29-03, 108:17-25; 111:21-112:6.

7.      The CWA Constitution also requires that union locals select an Election Committee, consisting of three individuals, to conduct all elections. See CWA Constitution, DN 26-4 at 75; How to Conduct Local Union Elections, DN 26-4 at 82, 85.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes that the CWA Constitution specifies the size of a local union's election committee or limits its authority to elections alone. See, e.g., CWA Constitution, Dkt. No. 26-04, 75 ("Locals shall select an election committee which shall conduct all elections and referenda . . .").

8.      The Election Committee is tasked with deciding "all questions concerning the conduct and challenges of elections" and ensures that the election is conducted in accordance with the law. DN 26-4 at 77-91.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes this fact to the extent that the CWA Constitution does not grant unlimited authority to a local's election committee, but, rather, explicitly states the authority of the election committee is

"subject to the right of appeal to the governing body and membership of the Local."  CWA

Constitution, Dkt. No. 26-04, 75; <u>see</u> Executive Committee Letter to McPherron, Ex. 29-13;

Executive Committee to McPherron, Ex. 29-14; CWA District 1 Letter to McPherron, Ex. 29-15

(illustrating appeals process in this case).

9.     In addition to the LMRDA and the CWA Constitution, the ability to nominate a

candidate is governed by Local 1400's Bylaws, which require that nomination be made at a

union membership meeting or by receipt of a self-obtained petition received from the Election

Committee. <u>See</u> Local 1400 By-Laws, C.W.A. – AFL-CIO, DN 26-4 at 97.

<u>Defendant's Response:</u>  Defendant disputes this statement to the extent "candidate" does

not include the office of Chief Steward, according to the cited portion of the Local 1400 bylaws.

10.     Because Local 1400 did not conduct a membership meeting during the September

2017 nomination period, receipt of a self-obtained petition was the only method by which

candidates could run for office. Trementozzi Dep., DN 26-03 at 23 ("Q: Could someone be

nominated in 2017 at a Membership Meeting? A: No. Q: Because why? Was there a

Membership Meeting before the election? A: No. Q: So the only way to be nominated in 2017

was through which method? A: Through the petitions.").

<u>Defendant's Response:</u>  Admitted.

In addition, the Defendant further offers the following. Before 2002, the Union's election

rules were more informal and included unwritten practices. Trementozzi Dep., Dkt. No. 29-03,

11:18-12:16.  Local 1400 election rules were formalized on or around 2003. Dkt. No. 29-03,

12:19-24. Since 2002, the Local 1400 Bylaws specified two methods for nominating a member

for election: via a union meeting or through a nomination petition. Local 1400 Bylaws, Dkt. No.

29-04, at 5; Req. Ad., Dkt. No. 29-05, ¶ 1. As the geographic span of Local 1400 makes

ensuring a quorum of members a challenge, the Union has used nomination petitions exclusively since at least 2002. Dkt. No. 29-01, ¶ 9; Dkt. No. 29-03, 67:8-16; 72:3-7.

11.     Local 1400's nomination process does not permit members to request a nomination petition on behalf of another member. Talbot Dep. at 87, DN 26-4 at 88-89 ("Q. So I, as a union member, can't call in and get a blank petition for one of my friends? A. No.").

    Defendant's Response:  Disputed in that Doc. 26-4 does not include the cited pages 87 and 88, including the quoted section.

12.     Petitions were available for request beginning on September 1, 2017, and completed petitions had to be received at the Election Committee's post office box not later than 4 p.m. on September 21, 2017. DN 1, DN 7, ¶ 10.

    Defendant's Response:  Admitted.

13.     In order to receive a petition, candidates were required to call the Election Committee and request a petition to run for their desired union position. See Nomination Notice, CWA Local 1400, DN 26-4 at 92.

    Defendant's Response:  Admitted.

14.     Candidates were also required to leave their name, home address, and contact number, and follow the call with a written request. See Nomination Notice, CWA Local 1400, DN 26-4 at 92.

    Defendant's Response:  Admitted.

15.     After receipt of a petition, candidates were required to secure the signatures of "at least 10% of the [Union] Members of [the] Local," or, for Vice Presidents, "10% of the Members of the affected District in good standing." DN 26-4 at 97.

    Defendant's Response:  Admitted.

In addition, Defendant further offers the following. From the period 2002 to 2017, no member has ever requested a petition for a member other than themselves, nor submitted a petition other than the one they had self-obtained. Dkt. No. 29-01, ¶ 10.

16.     The petitions themselves consisted of lined pieces of paper, which included the name of the candidate's desired office on the top of each page. See Petition, DN 26-4 at 100.

Defendant's Response:  Admitted that the cited Exhibit is the nomination petition for Executive Vice President. Defendant notes that the physical description of the exhibit in ¶ 16 is incomplete.

17.     Once a candidate obtained the requisite number of signatures, they were required to send the petition back to the Election Committee on or before September 21, 2017, so that the Election Committee could verify the eligibility of each candidate on September 22, 2017. See Nomination Notice, CWA Local 1400, DN 26-4 at 92. ("All self-obtained petitions must be completed and received . . . no later than 4:00 pm on Thursday, September 21, 2017. Petitions and eligibility of candidates will be verified on September 22, 2017 at 10:00 a.m. at the CWA Local 1400 office in Portsmouth, NH, by the Election Committee.").

Defendant's Response:  Admitted.

18.     After the petitions were verified, the election would occur in November. See Nomination Notice, CWA Local 1400, DN 26-4 at 92.

Defendant's Response:  Disputed in that the evidence cited makes no reference to the date of the 2017 election or the process following the verification of any Local 1400 election petitions on or after September 22, 2017.

19.     During the summer of 2017, several individuals, including Christopher McPherron ("McPherron"), Sumner Delaney ("Delaney"), who was serving as Local 1400's

Treasurer under Trementozzi, Lynda Bernson ("Bernson"), and James White ("White") decided to run for leadership positions within Local 1400. McPherron Dep., DN 26-2 at 7-9.

      <u>Defendant's Response:</u>  Disputed. Defendant disputes this statement to the extent that the cited factual record bears no connection to the purported statement of fact and, instead, points to McPherron's individual history of work and union membership. Further objecting, Defendant notes that evidence provided elsewhere by Defendant directly contradicts DOL's statement as to White. <u>See, e.g.</u>, White Texts, Dkt. No. 29-12, 1 (showing McPherron trying to convince White to run on September 12, 2017).

      20.    Trementozzi formed "Team Trementozzi," which included two of Trementozzi's officer-incumbents, Keri Evinson as Executive Vice President and Karen Cusson as Recording Secretary. Trementozzi Dep., DN 26-3 at 39-41; Team Trementozzi Flyer, DN 26-4 at 103.

      <u>Defendant's Response:</u>  Admitted in part and disputed in part. Defendant disputes the DOL's characterization of Team Trementozzi's initial formation and membership. First, though DOL lists only two "incumbent officers" as part of the team, Trementozzi testified that, at formation, his slate of candidates included (at least) a third officer-incumbent—Sumner Delaney as Treasurer. <u>See</u> Trementozzi Dep., Dkt. No. 26-03, 41 ("A. Karen was going to be on my team. Keri was going to run on my team. And I offered Sumner to run on my team, even though there were some issues."). Second, while the Flyer proffered as support by DOL lists a full slate of candidates for additional offices, it is dated September 11, 2017—during the pendency of the Local 1400 nomination period, as shown by Delaney's replacement by Theresa Dobson—and does not specify whether all other candidates were members at formation. <u>See</u> Team Trementozzi Flyer, Dkt. No. 26-04.

      21.    Neither McPherron nor Delaney advised Trementozzi of their intention to run for

a position within the leadership of Local 1400 because they feared retribution from him. <u>See</u> Excerpts of Deposition Transcript of Sumner Delaney ("Delaney Dep."), DN 26-10 at 6-7, 12-13; McPherron Dep., DN 26-2 at 37-40, 42.

    <u>Defendant's Response:</u>  Disputed. Defendant disputes Delaney's purported fear of retribution to the extent that his testimony describes interactions with Trementozzi which happened <u>after</u> Delaney had already been using his improper petition to obtain signatures. <u>See</u> Delaney Dep., Dkt. No. 26-10, 13 ("Q. Chris testified that the call on the 11th was at your suggestion following a conversation with Don? A. Yeah."). Defendant also disputes McPherron's purported motivation on similar grounds, as the only example of "retribution" McPherron had direct knowledge evident in the record was the "Sherber Flyer" he found "two business days" after she pulled papers for the 2017 nomination period. <u>See</u> McPherron Dep., Dkt. No. 26-10, 38. Indeed, the Sherber Flyer was <u>not even distributed</u> to members. Trementozzi Dep., Dkt. No. 29-3, 86:10-11. Nor was the Flyer significantly different than campaign material regarding Trementozzi already produced by the opposition slate itself. <u>See</u> Bernson Dep., Dkt. No. 29-08, 25-27; Delaney Dep., Dkt. No. 29-09, 141:16-142-23; Challenger Flyer, Dkt. No. 29-19. Thus, it was not "retribution" they feared, but rather they sought to evade campaigning that would hurt their candidacies.

    In contrast, at least one member of the opposition slate understood the group to be purposefully obscuring the campaign from Trementozzi generally. <u>See</u> Bernson Dep., Dkt. No. 29-08, 32:3-19; 80:4-14. Delaney, in particular, was set on deceiving Trementozzi into believing Delaney was still a member of the Trementozzi "team" and successfully prevented him from finding out until September 11, 2017. <u>See</u> Delaney Dep., Dkt. No. 29-09, 83:21-84:1-2; 85:9-10 ("It was like, cat's out of the bag. They know we're running."); 85:19-86:4.  Moreover,

Delaney's claims of fearing retribution have shown themselves to be exaggerated in other instances. <u>Compare</u> Delaney Dep., Dkt. No. 29-09, 42:19-22 <u>with</u>, Bernson Dep., Dkt. No. 29-08, 43 (showing Delaney's claim that he regularly needed an escort to use the bathroom at work was unknown to Bernson despite her workspace being immediately adjacent).

22.     There was no requirement in the CWA Constitution, its By-laws, or the LMRDA, which required that candidates announce their intention of running before the submission of their nomination petitions on September 21, 2017. McPherron Dep., DN 26-2 at 39.

<u>Defendant's Response:</u>  Disputed. Defendant disputes this statement as it lacks a sufficient evidentiary basis given that the cited section of McPherron's testimony does not reference the September 21, 2017 deadline or the submission of nomination petitions. Further disputing, McPherron's testimony is equivocal on this point –only that he was not "aware of" any rules requiring "everyone who wants to run [to] announce their name."  <u>See</u> McPherron Dep., Dkt. No. 26-02, 39.  Similarly, the Defendant believes McPherron to have an insufficient foundation for such knowledge as DOL has submitted no support for the underlying condition precedent: that McPherron has comprehensively read through the CWA Constitution, Local 1400 Bylaws, and/or the LMRDA (or that he would be a legal expert regarding the LMRDA). Indeed, McPherron has testified that he was broadly unaware of the Local 1400 Bylaws through the election, so it could not have affected his state of mind during the period in question. <u>See</u> McPherron Dep., Dkt. No. 26-02, 42.  Finally disputing, Defendant has not alleged an "announcement" requirement, but one to self-obtain, so the government's contention is broadly immaterial.

23.     McPherron called the Election Committee on September 1, 2017, the first day candidates could call and obtain petitions, and requested a petition for District 2 Vice President.

McPherron Dep., DN 26-2 at 17.

<u>Defendant's Response:</u> Admitted.

24.     Following McPherron's call to the Election Committee, several of his coworkers informed him that they, too, had called the Election Committee and requested petitions. McPherron Dep., DN 26-2 at 14.

<u>Defendant's Response:</u> Disputed. Defendant disputes this statement to the extent DOL relies on McPherron's recitation of out-of-court hearsay of other union members to prove the fact that they contacted the Election Committee to obtain petitions. <u>Vazquez v. Lopez-Rosario,</u> 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment.").

25.     One of McPherron's coworkers provided him with a petition for President, which she obtained by calling the Election Committee. McPherron Dep., DN 26-2 at 15.

<u>Defendant's Response:</u> Admitted in part and disputed in part. Defendant disputes this statement to the extent the cited evidentiary record does not support an assertion of how McPherron's coworkers obtained other petitions before giving it to him.

26.     McPherron possessed both a petition for President, which he obtained from his coworker, and a petition for District 2 Vice President, which he obtained by calling the Election Committee on September 1, 2017. McPherron Dep., DN 26-2 at 16.

<u>Defendant's Response:</u> Admitted in part and disputed in part. Defendant disputes this statement as it lacks a sufficient evidentiary basis given that the cited section of McPherron's testimony does not reference his self-obtained District 2 Vice President petition or the point at which he was first in possession of both a President and District 2 Vice President petition.

27.     Delaney called the Election Committee on September 1, 2017, to request a

petition for Treasurer. Delaney Dep., DN 26-10 at 55-56.

Defendant's Response:  Disputed in that the cited record does not support the statement.

28.    Delaney requested the Treasurer position with the intent to nominate Bernson for the position. Delaney Dep., DN 26-10 at 55-56.

Defendant's Response:  Disputed. Defendant disputes this statement to the extent Bernson herself has testified that it was her understanding Delaney would call for nomination papers to prevent Trementozzi from learning about the opposition slate, not because she understood Delaney would be nominating her. See Bernson Dep., Dkt. No. 29-08, 32:3-19; 80:4-14. In any event, the cited record does not support the Plaintiff's statement.

29.    During the weekend of September 9-10, 2017, McPherron, who decided to run against Trementozzi for President, and Delaney, who obtained a petition for Executive Vice President from a coworker and decided to run as McPherron's Executive Vice President, traveled over 500 miles to 12 telecommunications locations throughout New Hampshire, Maine, Massachusetts, and Vermont to obtain petition signatures from fellow union members. McPherron Dep., DN 26-2 at 17-18, 41; Delaney Dep., DN 26-10 at 8, 10, 15 ("Q: How many miles did you drive? A: Oh, almost 600, 700.").

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes this statement to the extent it lacks a sufficient evidentiary basis as to what states Delaney and McPherron visited during the weekend of September 9, 2017.

Defendant further notes that McPherron and Delaney had decided to run for offices other than District 2 Vice President and Treasurer long before the weekend of September 9, 2017. Following the 2017 Election Committee meeting, McPherron resigned from the Election Committee in order to pursue election as a Union officer. McPherron Dep., Dkt. No. 29-07,

96:10-19. In July and August, McPherron, Delaney, and Bernson collectively agreed to run as a

slate for, respectively, president, vice-president, and treasurer. Response Req. Admissions, Dkt.

No. 29-05, ¶ 6; McPherron Dep., Dkt. No. 29-07, 36:8-11; Bernson Dep., Bernson Dep., Dkt.

No. 29-08, 14-20, 23.  They began to put together an opposition campaign PowerPoint prior to

the nomination period. Response Req. Admissions, Dkt. No. 29-05, ¶ 7; Bernson Dep., Dkt. No.

29-08, 24-25. The three potential candidates also ordered campaign "fidget-spinners" with the

names of all three candidates during this period. Bernson Dep., Dkt. No. 29-08, 28. The

campaign material produced by McPherron and Delaney concentrated, in part, on a variety of

criticisms of Trementozzi as president. Dkt. No. 29-08, 25-27; Delaney Dep., Dkt. No. 29-09,

141:16-142-23.

In addition, Defendant further offers the following. In Delaney's mind, he and

McPherron were campaigning, "politicking" and discussing what they saw as problems with

how CWA 1400 was being run during the AT&T trip. Dkt. No. 29-09, 98:3-6; 125:12-126:1.

30.    McPherron provided James White, who decided to run for District 2 Vice

President, with the petition that he (McPherron) obtained from the Election Committee as a

result of his call on September 1, 2017, in order to nominate him. McPherron Dep., DN 26-2 at

23- 26.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes that

McPherron provided White with papers "in order to nominate him."  As shown by Plaintiff's

cited deposition testimony, McPherron provided these papers to White in order to provide him

with a head start on collecting signatures –a clandestine effort he thought would remain

undiscovered. McPherron Dep., Dkt. No. 26-02, 26:3-6, 17-23. Moreover, McPherron did not

consider the act of supplying the petition to White as an act of nomination, but rather that White

could use the papers to become nominated. Dkt. No. 26-2, at 23-24. This interpretation of events is confirmed by the contemporaneous communication McPherron had at the time with both Bernson and White. See McPherron Email, Dkt. No. 29-11; White Text, Dkt. No. 29-12. McPherron and Bernson were aware that White should have waited to receive the correct petition rather than using the one McPherron had obtained under false pretenses. Id. McPherron instructed White to lie and claim his petition was the one he has self-obtained should the issue be raised by the Election Committee. White Text Message, Dkt. No. 29-12; see Dkt. No. 29-10, 60-61 (describing creation of text message document in response to Local 1400 information request). Despite starting to collect signatures two weeks after the other three opposition candidates, White was able to collect the necessary number of nomination signatures. See Dkt. No. 29-05, ¶ 20; Dkt. No. 29-07, 50:5-14; Dkt. No. 29-11.

31.     On Monday, September 11, 2017, Trementozzi discovered that McPherron and Delaney had been obtaining signatures from union members for the positions of President and Executive Vice President. McPherron Dep., DN 26-2 at 19; Trementozzi Dep., DN 26-3 at 41-42.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes this statement to the extent it relies on McPherron's recitation of a conversation that Sumner Delaney allegedly had with Trementozzi. McPherron's testimony is not only equivocal and speculative (to the extent McPherron is unsure as to who the statements were allegedly made, or where), but is also hearsay-within-hearsay (as it is McPherron repeating out-of-court statements allegedly made to him by Delaney, who in turn was repeating out-of-court statements by Trementozzi). Further objecting, Defendant objects to the cited portion of Trementozzi's testimony as it only states that he "learned" that McPherron and Delaney were running for President and Executive

Vice President, not whether he knew they were collecting signatures.

32.     After a conversation between Delaney and Trementozzi on September 11, he (Delaney) told McPherron to call the Election Committee and request a petition for the position of President because Trementozzi stated that "he was going to advise the election[] committee that [the petitions] had to be self-obtained." McPherron Dep., DN 26-2 at 19, 30; Delaney Dep., DN 26-10 at 8-9 ("Q: What caused you to change your mind [and call the Election Committee to request a petition for Executive Vice President]." A: Don [Trementozzi's] outburst saying that he's going to retaliate against every f--g one of them"), 13.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes this fact's reliance on a purported conversation between Delaney and Trementozzi consistent with Defendant's Response to Plaintiff's SOF, supra, ¶ 31, which is incorporated herein by reference. Defendant further disputes this fact to the extent it relies on claimed threats of "retaliation" which do not bear a direct causal link to the pre-existing election requirement of "self-obtaining" a petition. Defendant also disputes this fact to the extent Delaney's deposition testimony references two different instances in which he supposedly heard Trementozzi speaking, and it is unclear from the submitted record as to which one caused him to talk to McPherron.

33.     Following Delaney's comment to McPherron, McPherron called the Election Committee and requested a petition for President. McPherron Dep., DN 26-2 at 19, 30; Delaney Dep., DN 26-10 at 8-9.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes this fact consistent with Defendant's Response to Plaintiff's SOF, supra, ¶ 31, which is incorporated herein by reference. Defendant also disputes this fact to the extent Delaney's cited testimony only states that he told McPherron that "he'd better call up and get papers for president," not

whether he did so. <u>See</u> Delaney Dep., Dkt. No. 26-10, 8.

34.     Delaney also called the Election Committee and requested a petition for

Executive Vice President, but he never received it because the Election Committee Chairperson,

Krystal Talbot, sent it to the wrong address. <u>See</u> Priority Mail, Return to Sender, DN 26-4 at

111.

<u>Defendant's Response:</u>  Admitted in part and disputed in part. Defendant disputes this

statement of fact to the extent it does not address any call by Delaney to the Election Committee,

any related request for a petition for Executive Vice President, whether it was sent by Krystal

Talbot, or whether it was sent to the wrong address. Defendant further disputes this statement to

the extent Delaney stated he did not care about these papers or look for them to be delivered.

Delaney Dep., Dkt. No. 29-9, 109-10.

35.     Krystal Talbot received Delaney's returned petition from the United States Postal

Service on September 21, 2017. Talbot Dep., DN 26-4 at 19-21.

<u>Defendant's Response:</u>  Admitted in part and disputed in part. Defendant disputes this

statement to the extent Talbot testified that she did not realize she had received Delaney's

returned petition until the following day, September 22, 2017. Talbot Dep., Dkt. No. 26-04, 19-

21.

36.     White and Bernson had petitions for the positions they intended to seek, which

they obtained from fellow union members, but also called the Election Committee to obtain

another copy of their petitions after Delaney's conversation with Trementozzi. McPherron Dep.,

DN 26-2 at 20-21, 24; Bernson Dep., DN 26-9 at 5, 6, 16, 17; Excerpts of Deposition Transcript

of Jim White ("White Dep."), DN 26-11 at 10 ("So Chris McPherron had gotten papers for the

same office that he wasn't going to use, and he offered to give me those papers. So I started off

using those."), 29-30, 38-41.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes McPherron's equivocating deposition testimony regarding Bernson, which does not establish how she obtained her first petition, whether she definitively called, or what relationship that might have to a purported conversation between Delaney and Trementozzi. See McPherron Dep., Dkt. No. 26-02, 21 ("Q. Do you know whether Linda had asked for treasurer papers? A. I believe she called in on the 11th as well. Q. Had she called in for some other papers earlier? A. I'm not -- I don't know.").

Defendant also disputes this statement as it relies on Bernson's testimony during which she was unable to remember exactly when she may have called for or received petitions. Bernson Dep., 26-09, 17 ("Q. So it would have been sometime between September 1 and September 21, right, that Sumner called and said, 'Hey, you have to call'? A. Right."). Defendant further disputes Bernson's deposition testimony consistent with Defendant's Response to Plaintiff's SOF, supra, ¶ 31, which is incorporated herein by reference, to the extent it is a hearsay-within-hearsay recitation of Delaney and Trementozzi's purported conversation.

In addition, Defendant disputes Plaintiff's characterization of White's testimony as White did not call at all for nomination papers until after Delaney's purported conversation with Trementozzi on September 11, 2017. See White Text, Dkt. No. 29-12. Finally, Defendant disputes Plaintiff's inclusion of testimony irrelevant to this statement of fact relating to an issue with Simone Kellyman. See White Dep., Dkt. No. 26-11, 16-17. In any event, though White received his self-obtained petition only days later, he unilaterally chose not to use it based on his personal and unverified belief that it might get the person who initialed it—Simone Kellyman, a member of the Election Committee—in trouble because she was on disability leave. White Dep.,

Dkt. No. 29-10, 38:6-14; see Dkt. No. 29-05, ¶ 11; Dkt. No. 29-05, 52:12-53:23.

37.     Trementozzi contacted Krystal Talbot and complained that McPherron, Delaney, and Bernson were collecting signatures from union members. Talbot Dep., DN 26-4 at 50- 51; Trementozzi Dep., DN 26-3 at 33-36; Handwritten Note of Krystal Talbot, DN 26-4 at 102.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes this statement of fact to the extent that it mischaracterizes the testimony of both Talbot and Trementozzi who both clearly stated that the complaint was with regard to McPherron, Delaney, and Bernson collecting signatures on petitions they had not self-obtained –not signature-collecting in the abstract. See Talbot Dep., Dkt. No. 29-02, 108 ("Q. (By Ms. Ollila) Was there something wrong with them collecting signatures? A. There's nothing wrong with them collecting signatures. Q. Did you tell that to Don on the telephone? A. There was nothing wrong with them collecting signatures. But if they were collecting signatures for petitions that they hadn't yet received, that weren't self-obtained, then there's a problem with that."); Trementozzi Dep., Dkt. No. 29-03, 78-80.

38.     Trementozzi frequently contacted Krystal Talbot to ask if individuals were requesting nomination papers and Trementozzi was the only person to do so. Talbot Dep., DN 26-4 at 53.

Defendant's Response:  Admitted.

39.     On September 11, 2017, Trementozzi contacted Delaney after learning that Delaney was running for Executive Vice President and Trementozzi told Delaney that he did not think he (Delaney) was qualified to run for office. Trementozzi Dep., DN 26-3 at 41-42.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes whether Trementozzi told Delaney that the latter was not "qualified to run for office," because

the cited testimony shows this statement only applied to the office of Executive Vice President, not Treasurer.

40.     Although McPherron, Delaney, Bernson, and White called the Election Committee on or shortly after September 11, 2017, and although McPherron, Bernson, and White obtained petitions from the Election Committee for their respective positions, each continued to collect signatures on the petitions they previously obtained because they had already traveled hundreds of miles collecting the signatures. McPherron Dep., DN 26-2 at 21 ("I [did not collect signatures on the petitions received after my call to the Election Committee on September 11] because I had already collected well over 100 signatures on the ones that we started. And we had driven all the way to St. Albans, Vermont, and worked our way down the state to meet the AT&T members . . ."); Bernson Dep., DN 26- 9 at 7-10; White Dep., DN 26-11 at 24-25.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes the accuracy of this entire statement as to Delaney given that Plaintiff has offered no direct evidentiary support with regard to him. Defendant disputes the motivation to continue gathering signatures as ascribed to Bernson and White because, by Plaintiff's admission, neither traveled "hundreds of miles collecting the signatures" prior to September 11, 2017. See Plaintiff's SOF, supra, ¶ 29 (listing only McPherron and Delaney). Indeed, Bernson directly testified as to her absence. See Bernson Dep., Dkt. No. 26-09, 10 ("18 Q. And can you describe what this document is? A. So it talks about us going to the AT&T stores, which I didn't do, and about some of the union people.") (emphasis provided). In addition, McPherron, Delaney, and Bernson worked at the Verizon offices in Lowell, Massachusetts. Dkt. No. 29-07, 83:11-23. According to Bernson, there were over 350 people in that office. See Bernson Dep., Dkt. No. 26-09, 49;

McPherron, Delaney, and Bernson only needed 96 signatures. <u>See</u> Dkt. No. 29-05, ¶ 19. Per White, Defendant disputes this fact consistent with Defendant's Response to Plaintiff's SOF, supra, ¶¶ 30, 36, insofar that (a) White did not get his papers until after the weekend trip of McPherron and Delaney, and (b) did not seek signatures on the correct petition because he sought a head-start.

41.    From September 1, 2017, until on or about September 7, 2017, the Election Committee had not dated or initialed any nomination petitions that were requested and sent to members. DN 1, DN 7, ¶ 11; Talbot Dep., DN 26-4 at 23-25.

<u>Defendant's Response:</u>  Admitted.

42.    Beginning on or about September 7, 2017, the Election Committee started placing the date and the committee member's initials in the bottom corner of all petitions requested and sent to members. DN 1, DN 7, ¶ 11; Talbot Dep., DN 26-4 at 23-25.

<u>Defendant's Response:</u>  Admitted.

In addition, Defendant further offers the following. Prior to the discovery of candidates using non-self-obtained petitions, nomination petitions were already being marked by members of the Election Committee with their own initials. Dkt. No. 29-02, 51:4-7; 84:12-24 ("Q. Why did you change it? Meaning, why did you start [initialing] on September 7? A. Well, a lot of different petitions had been going out with several people that requested all of the petitions. And then also, Katherine Scherber had sent communication which I can't remember -- I'd have to see that. I believe she sent me a text message. And then I was thinking that I have to somehow keep track of the paperwork that's going out going forward. There's nothing I could do in hindsight, but going forward.").

43.    The Election Committee members did not advise the members, including

McPherron, Delaney, Bernson, or White, of this change to the nomination process – that the petitions that were sent by the Election Committee would now be dated and initialed. Talbot Dep., DN 26-4 at 24-25. Delaney Dep., DN 26-10 at 16 ("I did not know that the paperwork was marked differently."); Bernson Dep., DN 26-9 at 12; Petition for President, CWA Local 1400 (Chris McPherron), DN 26-4 at 101.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes the accuracy of this entire statement as to White given that Plaintiff has offered no evidentiary support with regard to him. In addition, Defendant disputes whether initialing constituted a "change in the nomination process" to the extent Talbot testified it was a ministerial act of record keeping and enforcement of existing rules, not a new rule itself. See Talbot Dep., Dkt. No. 29-09, 50, 85 ("I didn't change any requirements [by initialing petitions starting September 7].").

In addition, Defendant further offers the following. Following their request on or about September 11, 2017, McPherron and Bernson received envelopes containing new self-obtained petitions, but did not bother opening them. Dkt. No. 29-05, ¶ 16; Dkt. No. 29-07, 56:5-12; Dkt. No. 29-08, 105:7-12. Had they done so; they would have observed the initialing. Indeed, White did notice them, but decided to disregard them. See White Dep., Dkt. No. 29-10, 38:6-1

44.     Submitting the newly-sent forms would have required McPherron, Bernson, and White to start anew, obtain signatures again and submit the union members' signatures on the form Talbot sent to them on or after September 11, 2017. Talbot Dep., DN 26-4 at 24-25.

Defendant's Response:  Disputed. Defendant disputes the accuracy of this statement as to McPherron, Bernson, and White because Plaintiff has offered no evidentiary support with regard to any of the three in their citation.

45.[1]     Although McPherron, Delaney, Bernson, and White called the Election Committee on or shortly after September 11, 2017, to obtain additional petitions, each turned in the already signed petitions that they had received from their union coworkers, so their submitted petitions did not include the initials of Election Committee members. See Petition for President, Chris McPherron, DN 26-4 at 109; Petition for Executive Vice President, Sumner G. Delaney, id. at 110; Petition for Treasurer, Lynda Bernson, id. at 116; Petition for District 2 Vice President, Jim White, id. at 112.

Defendant's Response:  Admitted

46.     McPherron, Delaney, Bernson, and White submitted nomination petitions for the positions of President, Executive Vice President, Treasurer, and District 2 Vice President, respectively. DN 1, DN 7, ¶¶ 12-16; CWA Local 1400 Certification of General Election, DN 26-4 at 105.

Defendant's Response:  Admitted

47.     The petitions submitted by members of Team Trementozzi did not contain the initials of Election Committee members because they were obtained prior to September 7, 2017. Talbot Dep., DN 26-4 at 57-60; Petition for President, Don Trementozzi, id. at 106; Petition for Executive Vice President, Keri Evinson, id. at 107; Petition for Recording Secretary, Karen Cusson, id. at 108.

Defendant's Response:  Admitted in part and disputed in part.

48.     Krystal Talbot had no way of knowing whether Trementozzi, Keri Evinson, or Karen Cusson utilized the nomination petitions sent to them prior to September 7, 2017, because their completed petitions did not contain her initials, which were only placed on petitions sent on or after September 7, 2017. Talbot Dep., DN 26-4 at 38-45.

---

[1] For clarity, Defendant has corrected a small error in numbering contained in the original submission.

Defendant's Response:  Defendant disputes this statement of fact to the extent that it mischaracterizes the testimony of Talbot, who was clear that she understood Trementozzi and others to have used the petition initially sent to them, because they had only requested one petition. See, e.g., Talbot Dep., Dkt. No. 26-04, 42 ("Q. (By Ms. Ollila) So how do you know that Don Trementozzi used said petition that you sent him on the 1st to collect signatures? A. I knew that I only sent him out one petition."). Additionally, Defendant notes that Plaintiff has not alleged that Trementozzi/Evinson/Cusson petitions were anything other than their self-obtained petitions.

49.     The Election Committee, consisting of Krystal Talbot and Cheryl Maglio, met on September 22, 2017, at the Local 1400 Office in Portsmouth to verify the petitions of the candidates. During the Election Committee meeting, it was determined that the petitions of McPherron, Delaney, Bernson, and White would be disqualified for not being self- obtained. Talbot Dep., DN 26-4 at 58-61, 64; McPherron Dep., DN 26-2 at 44-45.

Defendant's Response:  Defendant disputes this statement as it lacks a sufficient evidentiary basis.

50.     The election committee determined that these petitions had not been self-obtained because McPherron, Delaney, Bernson, and White each turned in a petition that failed to include the initials of an Election Committee member on the bottom right corner. Talbot Dep., DN 26-4 at 58-61, 64; McPherron Dep., DN 26-2 at 44-45.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes the accuracy of this statement consistent with Defendant's Response to Plaintiff's SOF, supra, ¶ 49, which is incorporated herein by reference.

51.     The Election Committee determined that Trementozzi, Keri Evinson, and Karen

Cusson were eligible to run for office, even though their petitions also did not include Talbot's initials on the bottom right corner. Talbot Dep., DN 26-4 at 58-61, 64; McPherron Dep., DN 26-2 at 44-45.

Defendant's Response:  Admitted in part and disputed in part. Defendant disputes the accuracy of this statement consistent with Defendant's Response to Plaintiff's SOF, supra, ¶ 49, which is incorporated herein by reference. Furthermore, Defendant disputes the phrase "even though their petitions also did not include Talbot's initials on the bottom right corner" to the extent Talbot has testified that the issue was whether candidates had self-obtained, not whether initials were present. See Talbot Dep., Dkt. No. 26-04, 38, 64.

52.    At the time of the election, McPherron, Delaney, Bernson, and White were all members in good standing, and each of their nomination petitions was timely submitted, contained the requisite number of signatures, and otherwise met all eligibility criteria. DN 1; DN 7, ¶ 16.

Defendant's Response:  Admitted.

53.    Trementozzi, Keri Evinson, and Karen Cusson qualified as candidates and were elected without opposition. Talbot Dep., DN 26-4 at 41-42; CWA Local 1400 Certification of General Election, DN 26-4 at 105.

54.            Defendant's Response:  Admitted Article XV, Section 4(b) of the CWA Constitution states that "[a]ny challenge to the conduct of an election must be filed in writing with the election committee within 10 days of the tentative certification of the results." CWA Constitution at 24, DN 26-4 at 70-76.

Defendant's Response:  Admitted.

55.    By letter dated September 25, 2017, to the Election Committee, McPherron filed

a timely objection to the Election Committee's disqualification of his petition for the office of President, as well as the disqualification of the petitions belonging to Delaney, Bernson, and White, on the basis of the self-obtained petition requirement. DN 1; DN 7, ¶ 19.

    <u>Defendant's Response:</u>  Admitted.

56.    By letter dated October 4, to McPherron, the Election Committee upheld its disqualification. DN 1; DN 7, ¶ 20.

    <u>Defendant's Response:</u>  Admitted.

57.    McPherron appealed the decision of the Election Committee to the Executive Board by letter dated October 10, 2017. DN 1; DN 7, ¶ 20.

    <u>Defendant's Response:</u>  Admitted.

58.    By letter dated November 20, 2017, to McPherron, the Executive Board denied the appeal. DN 1, DN 7, ¶¶ 21, 22.

    <u>Defendant's Response:</u>  Admitted.

59.    McPherron appealed the decision to CWA District 1 Vice President Dennis Trainor, who rejected McPherron's appeal. DN 1, DN 7, ¶ 23; McPherron Dep., DN 26-2 at 73-

    <u>Defendant's Response:</u>  Admitted.

60.    On January 9, 2018, McPherron filed a complaint with the U.S. Department of Labor, Office of Labor Management Standards and an investigation was initiated. DN 1, ¶ 24; Declaration of Laura Corbin, DN 26-5, ¶ 2.

    <u>Defendant's Response:</u>  Admitted.

61.    President Trementozzi, Executive Vice President Keri Evinson, and Recording Secretary Karen Cusson are currently serving their uncontested election term, which began on January 1, 2018, and is scheduled to expire on December 31, 2020. <u>See</u> Local 1400 By- Laws,

C.W.A. – AFL-CIO, DN 26-4 at 98.

    <u>Defendant's Response:</u>  Admitted.

                                Respectfully submitted,

                                Local 1400, Communications Workers of America, AFL-CIO

                                By its counsel,

                                <u>/s/ James A.W. Shaw</u>
                                Paul F. Kelly, *Pro Hac Vice*
                                James A.W. Shaw, N.H. Bar No. 266358
                                Segal Roitman, LLP
                                33 Harrison Ave., 7th Floor
                                Boston, MA 02111
                                (617) 603-1432
Dated: July 10, 2019                jshaw@segalroitman.com


## CERTIFICATE OF SERVICE

I certify that on July 10, 2019 a copy of the foregoing document was served via ECF upon counsel for R. Alexander Acosta (Terry Ollila, Esq., AUSA).

                                <u>/s/ James A.W. Shaw</u>